UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

GINA MARIE JIMENEZ,

    Plaintiff,

    v.

NANCY A. BERRYHILL,

    Defendant.

Case No. 17-cv-04323-RMI

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 27

    Plaintiff, Ms. Gina Marie Jimenez, seeks judicial review of an administrative law judge ("ALJ") decision denying her application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security, which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (Docs. 5 & 10), and both parties have moved for summary judgment (Docs. 18 & 27). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

    The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**PROCEDURAL HISTORY**

On May 22, 2014, Plaintiff filed applications for benefits under Titles II and XVI, alleging a disability onset date of May 2, 2014. (Doc. 14, Administrative Record "AR" at 22). The ALJ denied the applications on March 23, 2017 (AR at 26), and the Appeals Council denied Plaintiff's request for review on June 20, 2017 (AR at 1-5).

**SUMMARY OF THE RELEVANT EVIDENCE**

Plaintiff alleges disability based on the following impairments: post-traumatic stress disorder, anxiety, depression, degenerative disc disease, and bilateral hand osteoarthritis. Pl.'s Mot. (Doc. 18) at 5. The ALJ determined that Plaintiff suffered all of those impairments, and that they were severe; additionally, the ALJ determined that Plaintiff had also suffered from alcohol abuse, and that this condition was also severe. (AR at 18).

*Plaintiff's Function Report:*

On February 15, 2016, Plaintiff completed and submitted an SSA form entitled, "Function Report – Adult." (AR at 328-335). Therein, she noted that it was difficult for her to speak with people; that she can barely force herself to leave the house some days; that her wrists are a source of great pain; that she is mentally and physically incapable of performing past work due to anxiety and arthritis; that she is depressed and doesn't know why; and, that she avoids conversation at all costs as it is too painful to deal with people. (*Id*. at 328-329). Plaintiff noted that her conditions affect her ability in lifting, communicating, talking, understanding, remembering, completing tasks, and concentrating. (*Id*. at 333).

\\

*Plaintiff's Hearing Testimony*:

At the February 7, 2017, hearing before the ALJ, Plaintiff's counsel opened by relating that Plaintiff lost jobs or otherwise had to leave due to difficulty using her hands. (AR at 37). Counsel also related that Plaintiff lives in Walhala, California, a remote location with limited treatment options. (*Id*.). Counsel then noted that Plaintiff also suffers from severe anxiety, PTSD, depression, and panic attacks, as noted by her treating physician. (*Id*. 37-38). Counsel added that her treating physician's notes even indicate that he personally observed Plaintiff have panic attacks on a number of occasions in the examination room while discussing the panic attacks themselves. (*Id*. at 37).

Plaintiff, who is currently 56 years old, testified that with the assistance of public benefits she currently lives in a motel room with her son who is 20 years old and suffers from an undiagnosed gastrointestinal disorder. (*Id*. at 40). She related that she completed the 11th grade in school, and that her only prior job training had been in waitressing and housekeeping. (*Id*. at 41). Between January and May of 2016, Plaintiff briefly worked as a cashier two days per week for approximately 5 hours per day. (*Id*. at 42). She was forced to stop working in that capacity, in part due to the intense pain in the front of her left leg, the groin area, and her lower back any time that she remained standing for more than 20 to 30 minutes. (*Id*. at 43, 55-56, 64). Plaintiff also informed the ALJ she had been prescribed wrist braces that she wears anytime she has to do anything with her hands. (*Id*. at 49). She did not wear the wrist braces on duty as a cashier, however, due to a fear that she might lose the job if she were seen wearing the braces on duty. (*Id*. at 50). Indeed, wrist pain and loss of wrist function had, in part, caused Plaintiff to lose a previous job as a waitress because she did not have the hand strength to hold cups or plates. (*Id*. at 56). At night, Plaintiff is often awakened due to numbness and spasms in her hands; during the day, she has "a lot of pain consistently throughout the day" with both wrists if she so much as tries to move her hands, let alone holding or manipulating objects. (*Id*. at 57). Consequently, Plaintiff has difficulty in self-care and requires help with tasks ranging from cutting food to getting dressed. (*Id*. at 58). As little as five minutes of using her hands causes Plaintiff's pain to become unbearable, forcing her to stop whatever she was doing. (*Id*.). Plaintiff was referred to see a

3

physical therapist, however, the closest one was nearly an hour's drive away, and Plaintiff testified that she never went due to the fact that she could not drive herself that far, nor could she afford to pay for others to transport her. (*Id*. at 56).

Another factor in Plaintiff's leaving her part-time employment as a cashier was her intense anxiety about dealing with people, and her frequent anxiety attacks which happened at least three times during any given workday, and which would cause her to need to go outside and be alone for several minutes in order to calm down while other employees took over her duties. (*Id*. at 53-54, 58). Plaintiff noted that she had suffered anxiety attacks for many years, and described them as involving a profound difficulty with breathing, a perception of tunnel vision, and a feeling that she was about to lose consciousness. (*Id*. at 54-55). Plaintiff still experiences panic attacks on a daily basis, even when she's at home. (*Id*. at 59-60). She described the panic attacks as such: "It's really scary. I can't breathe . . . I feel claustrophobic . . . [I need to] [g]et to a window or get out the door. I've even had to get out the door half-dressed without even being able to get my clothes on, and I've been on my hands and knees outside." (*Id*. at 60). She also experiences such attacks in the middle of the night, essentially awakening to a panic attack (*Id*.). Plaintiff does not know what triggers the panic attacks, but agreed under questioning by her counsel that having PTSD and having been in a number of physically abusive relationships were likely related causes for her panic attacks. (*Id*. 61). Plaintiff also related that she suffers from depression and that it "is with me every day . . . there's a lot of days where I just can't leave the room . . . I have doctors' appointments [and] sometimes I can't go . . . I have no drive . . . I can't make myself be around people. I can't – I just can't . . . I just sit in the motel room." (*Id*. at 62). Plaintiff lost her previous job as waitress because she frequently needed to "hide in the back and let waitresses – the other waitresses take my tables." (*Id*. at 63). Lastly, regarding prior alcohol use, Plaintiff testified that while she used to drink two to three beers a night to help her sleep, that she had completely discontinued drinking in June of 2016. (*Id*. at 52).

*Vocational Expert's ("VE") Hearing Testimony:*

The ALJ formulated a hypothetical for the VE's consideration involving an individual of Plaintiff's age, education, and with the same job history, but capable of medium work with

4

United States District Court
Northern District of California

frequent handling with the upper left extremity. (AR at 68). The ALJ then asked the VE if such a person could perform any of her past work, which the VE answered in the negative. (*Id*. at 69). When asked whether such a person could perform any other work, the VE suggested that such a person could work as a laundry worker (with 120,000 such jobs nationally), as a hospital cleaner (with 200,000 such jobs nationally), or as a stores laborer (with 200,000 such jobs nationally). (*Id*. at 69-70). The ALJ then formulated a secondary hypothetical for the VE's consideration involving the same individual but with additional limitations of frequent (as opposed to constant) fingering with the upper left extremity, and frequent handling and fingering with the upper right extremity, and occasional (as opposed to frequent or constant) interaction with the public. (*Id*. at 70). The ALJ then asked the VE if such a person could perform any of their past work, which the VE also answered in the negative. (*Id*. at 70-71). The ALJ then formulated a third hypothetical involving the additional limitation of light work, and asked the VE if such a person could perform any past work. (*Id*. at 71). The VE suggested that such a person could perform the work of a housekeeping cleaner. (*Id*.). When asked what other jobs such a person may perform, the VE suggested the jobs of office helper, handmade Mexican food maker, and photocopy machine operator. (*Id*.). The ALJ then asked the VE if there would be any work available for any of the individuals in the three hypotheticals if they were off-task for 20% of the workday, the VE answered in the negative. (*Id*. at 72). Indeed, the VE testified that if such a person were off-task as little as 10% of the time, there would be no work available for such a person. (*Id*. at 73). Lastly, the VE added that anything over eight hours per month of absences from work on a consistent basis would also mean that there would be no work available for such a person. (*Id*. at 74).

*The Lay Witness Testimony:*

On February 16, 2016, Plaintiff's mother, Ms. Norma Wilcox, completed and submitted a form entitled, "Function Report – Adult – Third Party." (AR at 320-327). Ms. Wilcox related that she sees her daughter once every two months, but that they generally speak with each other daily. (*Id*. at 320). Ms. Wilcox described Plaintiff's primary impediment to her ability to do any work at all as such: "[i]t's really hard to look people in the eye and it's difficult to be around people[,] makes you want to be by yourself[,] it's hard [for Plaintiff] to communicate." (*Id*.). Ms. Wilcox

5

also made it clear that Plaintiff is only able to perform minimal tasks at home and that her son helps her in that regard to a great extent. (*Id*. at 322). She added that Plaintiff rarely leaves the house, generally leaving once a week to shop for food and necessities with her son. (*Id*. at 323). Ms. Wilcox also noted that Plaintiff does not associate with anyone socially, and that "she doesn't want to see anybody, even family members." (*Id*. at 324-325). She described Plaintiff's conditions as affecting her ability to lift or otherwise use her hands, as well as her memory, understanding, concentration, and her ability to complete tasks in that she can only follow instructions "after being told several times or more." (*Id*. at 325).

*The Medical Evidence:*

In early February of 2013, Plaintiff was treated by Michael J. Star, M.D., an orthopedic specialist, for her bilateral thumb pain. (AR at 403-405). Dr. Star's physical examination noted tenderness at the base of each of Plaintiff's thumbs, with the left thumb being affected to a greater extent. (*Id*. at 403-404). Following his physical examination and a review of Plaintiff's x-rays, Dr. Star diagnosed her condition as basilar thumb arthritis along with possible thinning of the radioscaphoid joint; he provided Plaintiff with wrist splints in hopes of improving her symptoms while cautioning that he may recommend injections or surgery in the event that her symptoms did not abate. (*Id*. at 405, 409). In late March of 2014, when Plaintiff reported to urgent care due to right knee pain, the examination notes observed swelling at the base joint of her left thumb. (*Id*. at 349). The x-ray image indicated the cause of Plaintiff's right-knee pain was possibly due to medial meniscal injury. (*Id*. at 366). On May 9, 2014, Plaintiff was seen by her primary care provider complaining of severe lower back and left flank pain, and the physical exam notes included a notation about right lumbar para-spinal tenderness (*Id*. at 353-354). The following week, Plaintiff was seen again and the physical examination notes included observations to the effect that Plaintiff had a decreased range of motion in her spine and that extending or flexing caused pain; additionally, the provider's comments as to Plaintiff's psychiatric condition noted that Plaintiff "is very anxious." (*Id*. at 357).

On October 17, 2014, Plaintiff was seen by her primary care provider at RCMS Community Health Care for anxiety. (*Id*. at 370-372). Plaintiff reported severe anxiety with daily

occurrences of panic attacks, as well as a feeling of being "on edge" and depressed all the time. (*Id*. at 370). Plaintiff reported that she had relationship problems with her abusive boyfriend, with whom she was living at the time, and that she wanted to move out of his house, but did not have enough money even for low-income housing; indeed, given her inability to pay him rent, he would frequently kick her out of the residence. (*Id*.). Plaintiff reported that depression and anxiety run in her family, that during her panic attacks she feels as though she is suffocating, and that she gets increasingly anxious just thinking about the possibility of having another panic attack. (*Id*.). Her provider's physical examination noted that Plaintiff presented with a flat affect and that her overall appearance was that of a depressed person; accordingly, she was referred to see the RCMS staff psychologist, Dr. Jefferson Nerney. (*Id*. at 371).

During a January 8, 2015, visit with her primary care provider, Mana Hobson, M.D., Dr. Hobson noted that Plaintiff "presents with anxious/fearful thoughts, depressed mood, difficulty concentrating, diminished interest or pleasure, excessive worry, fatigue, feelings of guilt and restlessness . . . [t]he anxiety is aggravated by alcohol use, conflict or stress, lack of sleep, social interactions, traumatic memories and winter season." (*Id*. at 375-376). Dr. Hobson's assessment at the time was that although Plaintiff had made many recent positive changes, such as leaving an abusive boyfriend and stopping drinking altogether, that Plaintiff still would not be able to work for at least another 10 weeks. (*Id*. at 376). That same day, Plaintiff underwent an individual psychotherapy session with Dr. Nerney. (*Id*. at 373-374). Dr. Nerney noted that Plaintiff's clinical depression was chronic and found that it was rooted in the history of Plaintiff's painful relationship as well as in complex family issues. (*Id*. at 373). As early as during this initial meeting, Dr. Nerney found Plaintiff's affect to be constricted, her mood to be anxious and depressed, her impulse control to be poor, and her self-perception to be abasing; his initial impression was that Plaintiff suffered from adjustment disorder with mixed anxiety and depressed mood. (*Id*. at 374).

Two months later, on March 16, 2015, Plaintiff was treated again by Dr. Hobson for anxiety, headaches, and left wrist pain. (*Id*. at 431-433). Dr. Hobson noted that there had been a worsening of Plaintiff's previously reported anxiety symptoms. (*Id*. at 431). On March 27, 2015,

Plaintiff was seen by Dr. Nerney for an individual psychotherapy session, resulting in an updated impression that Plaintiff suffered from unspecified episodic mood disorder. (*Id*. at 437-438). Following this session, Dr. Nerney's notes indicated that Plaintiff had recently suffered abuse from her boyfriend, and that Plaintiff had begun to open up to Dr. Nerney in discussing her childhood trauma. (*Id*. at 534). In this regard, Dr. Nerney wrote that as the eldest sister, Plaintiff often stood up to her abusive parents on behalf of her younger siblings and would in turn be demonized by her parents to the point of becoming marginalized from participation in the family dynamic. (*Id*.). Accordingly, Plaintiff was forced from her childhood home at the age of 14 and thereafter encountered difficulties with homelessness and substance abuse. (*Id*.). Plaintiff underwent further psychotherapy with Dr. Nerney on April 10, 2015. (*Id*. at 531-533).

On April 15, 2015, Plaintiff had another office visit with her primary care provider. (*Id*. at 439-442). Dr. Hobson noted the chronic nature of Plaintiff's symptoms due to anxious depression; noting also that Dr. Hobson planned to discuss Plaintiff's case with a psychiatrist, but that in the meantime, Plaintiff's disability form was completed for the following 6 months. (*Id*. at 439). Dr. Hobson also added that Plaintiff was "too upset and disorganized to work," and that while Plaintiff would like to return to work, she simply wasn't up to it at the time. (*Id*.). The following month, on May 12, 2015, Plaintiff underwent another session of individual psychotherapy with Dr. Nerney. (*Id*. at 443-444). Finding that her unspecified episodic mood disorder and her clinical depression symptoms were still chronic, Dr. Nerney continued Plaintiff on her medication (lorazepam) intended to be taken during panic attacks. (*Id*. at 444). Further, as a result of this session, Dr. Nerney noted that Plaintiff suffered from self-loathing due to her perception that she was "crazy" much in the same way as her mother. (*Id*. at 529). When Plaintiff was 14, her father divorced her mother and brought in a step-mother who was an abusive alcoholic, prior to which Plaintiff idolized her father and stayed away from her mother. (*Id*.). Following this event, Plaintiff's father began (with his new wife's help) to blame Plaintiff for everything wrong with the family, repeatedly telling her that she was "crazy" and that she would never amount to anything. (*Id*.). Dr. Nerney also noted that when Plaintiff's younger sister suffered abuse from their new step-mother, Plaintiff intervened and was thereafter forced to leave her home by being berated for her mental

8

illness. (*Id.*). Thereafter, from the age of 14 onwards, Plaintiff was involved in a series of primary relationships involving abusive partners. (*Id.*). Dr. Nerney thus found that while Plaintiff was at a critical juncture in her adolescent development, her family was torn apart and her father transformed from being the object of her adoration to being her enemy, meaning that from the age of 14 onwards, if Plaintiff was to be loyal to her family, she would necessarily need to loathe herself. (*Id.*).

During a follow-up visit on July 15, 2015, Dr. Hobson noted that Plaintiff continued to present with "anxious/fearful thoughts, depressed mood, difficulty concentrating, difficulty falling asleep, difficulty staying asleep, diminished interest or pleasure, excessive worry, fatigue and poor judgment." (*Id.* at 445-448). On November 26, 2015, Dr. Hobson treated Plaintiff again, and noted that Plaintiff now suffered from bilateral post-traumatic osteoarthritis of the first metacarpal joints. (*Id.* at 453). In this regard, Dr. Hobson assessed that Plaintiff's wrist problems were worsening, that her left wrist pain now radiates up her left arm and is aggravated by as little as simply carrying plates; the treatment plan was to assess the situation further during a future visit. (*Id.*). During the same visit, Dr. Hobson also noted an increase in Plaintiff's depressive episodes, and accordingly increased the dosage of one of Plaintiff's medications. (*Id.*). Dr. Hobson also noted that Plaintiff had inquired about the possibility of speaking to a female therapist. (*Id.*). She then added that Plaintiff has dealt with issues of childhood sexual abuse coupled with apparent amnesia – the eldest of 3 children, and with the other two recalling such abuse at an early age at the hands of a relative, Plaintiff recalls some abuse but does not remember being molested herself. (*Id.* at 454). The following month, Dr. Hobson treated Plaintiff again, noting both of Plaintiff's wrists were now aggravated, and in addition to the osteoarthritis in both wrists, that Plaintiff may also be suffering from a bone spur in her left wrist. (*Id.* at 457). Dr. Hobson characterized the wrist ailments as causing "decreased mobility, joint instability, [and] joint tenderness and weakness." (*Id.*). As to Plaintiff's anxiety disorder and her depressive episodes, Dr. Hobson noted that her risk factors now include "childhood abuse or neglect, chronic illness, financial worries, history of depression, relationship problems, unemployment and victim of abuse or violence." (*Id.*).

Thereafter, from January through May of 2016, Plaintiff underwent individual

psychotherapy sessions with Dr. Nerney on at least a monthly basis, sometimes more. (*Id*. at 460-463, 472-473, 482-483, 491-496, 510-528). With the benefit of ongoing psychotherapy, Dr. Nerney now assessed Plaintiff's psychological condition as including the following chronic conditions: generalized anxiety disorder, post-traumatic stress disorder, and major depressive disorder. (*Id*. at 462). During one of these sessions, on February 3, 2016, Dr. Nerney noted that Plaintiff had revealed more of her personal history, leading Dr. Nerney to conclude: that Plaintiff had been serially abused; that she had suffered formative traumas due to sexual and physical abuse throughout her adolescence as well as repeated physical abuse within her adult relationships; that she still "has not yet formed an integrated and stable personality"; that she has not been able to maintain stable employment due to her physical impairments "in addition to erratic behavior related to a chronic mood condition"; and, that Plaintiff "meets the diagnostic criteria for post-traumatic stress disorder, chronic, without delayed onset." (*Id*. at 523).

On March 2, 2016, during another psychotherapy session, Dr. Nerney administered a battery of tests including: Cognisat (a cognitive neurobehavioral status examination), Post-Traumatic Stress Diagnostic Scales, Beck's Depression Inventory-II, and Beck's Anxiety Inventory. (*Id*. at 519-522). Following the tests, Dr. Nerney concluded that Plaintiff suffers from feelings of inadequacy and inferiority, self-depreciation, self-doubt, marked discomfort dealing with others, acute self-consciousness, and negative expectations. (*Id*. at 519). Dr. Nerney also concluded that Plaintiff's trauma was rooted in her exposure to chronic sexual abuse, contemporaneously with her sisters, at the hands of her grandfather; further, he concluded that the sexual abuse caused Plaintiff to rebel, which in turn cause her to become the target of violence at the hands of her father and step-mother. (*Id*. at 520). Importantly, Dr. Nerney wrote that when interviewed about the aspects of her sexual abuse, Plaintiff "was twice observed having panic attacks (sweating, hyperventilation, flushed face, shakiness, and expressing the need to leave or to open a door or window). It is my opinion that [Plaintiff] suffers from a major depressive disorder and a post traumatic condition that renders her unable to succeed in a competitive work environment." (*Id*.). During a subsequent session, on April 19, 2016, Plaintiff had a third panic attack in Dr. Nerney's office. (*Id*. at 513).

On March 23, 2016, Dr. Hobson treated Plaintiff for a constant and worsening pain that would originate in the in-groin area and radiate to the left foot; Dr. Hobsons's assessment was that Plaintiff was suffering from bursitis in her left hip. (*Id*. at 478-481, 488-490). A few weeks later, on May 19, 2016, Plaintiff reported to urgent care and was assessed with chronic lower back pain with sciatica, with left hip pain, and with other chronic pain – a battery of x-rays were ordered. (*Id*. at 497-501). On June 10, 2016, at a follow-up visit stemming from Plaintiff's previous urgent care visit, her provider wrote that Plaintiff's lower extremity symptoms were suggestive of hip bursitis while adding, "unfortunately[,] I don't do hip bursal injections." (*Id*. at 502). During the same visit, Plaintiff's provider also noted that Plaintiff continued to suffer from adjustment disorder with mixed anxiety and depressed mood, and that she should continue her therapy sessions with Dr. Nerney while also considering a psychiatric consult due to her family history of mental health and substance abuse disorders, as well as Plaintiff's own history of childhood sexual abuse. (*Id*.). It was also noted that there was a worsening of Plaintiff's anxiety symptoms, as well as the symptoms associated with her leg pain in that as little as 10 minutes of standing or a few minutes of walking would cause extreme pain. (*Id*. at 503). As to the results of the x-ray imaging of Plaintiff's wrists, Cynthia Humphries, M.D., stated in her report that Plaintiff suffered mild osteoarthritis in her right wrist involving three distinct locations; mild osteoarthritis in her left wrist involving two locations; and, moderate osteoarthritis in her left wrist at three locations. (*Id*. at 645). Regarding the x-ray imaging of Plaintiff's spine, Mark Harshany, M.D., stated in his report that Plaintiff suffers from degenerative spondylosis of the lumbar spine. (*Id*. at 389-390).

During a June 21, 2016, office visit, Dr. Hobson noted that Plaintiff's symptoms related to her anxiety and depression were chronic in that they occurred daily; Dr. Hobson suggested that Plaintiff continue her sessions with Dr. Nerney and that she continue to talk through her issues while employing various relaxation techniques. (*Id*. at 506). Additionally, relating to Plaintiff's left hip pain, Dr. Hobson referred her for a surgical consultation in Santa Rosa, California. (*Id*.).

Following another psychotherapy session on January 31, 2017, Dr. Nerney wrote that based on his observations of Plaintiff's presentation of symptoms over time (i.e., her panic attacks with hyperventilation, flushed skin, sweating, her need to escape the confines of the medical suite,

and her depressive expressions), it was Dr. Nerney's opinion that Plaintiff "is not able to maintain stable employment in either a supported or competitive environment" because Plaintiff "experiences intolerable internal pressures when she is exposed socially under most circumstances." (*Id*. at 571). On February 7, 2017, on Plaintiff's behalf, Dr. Nerney executed a form entitled, "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment." (*Id*. at 576-580). Therein, Dr. Nerney opined that Plaintiff suffers limitations which *seriously interfere* with her ability to perform in the following areas on a regular and sustained basis for 8 hours per day, during 5 days per week: (1) to understand and remember detailed instructions; (2) to carry out short and simple instructions; (3) to ask simple questions or request assistance; and, (4) to respond appropriately to changes in the work setting. (*Id*. at 556-558). Dr. Nerney also opined that Plaintiff suffers limitations which *preclude* her ability to perform in these areas on a regular and sustained basis for 8 hours per day, during 5 days per week: (1) to carry out detailed instructions; (2) to maintain attention and concentration for 2-hour segments of time; (3) to make simple work-related decisions; (4) to interact appropriately with the general public; (5) to accept instructions and respond appropriately to criticism; (6) to maintain socially appropriate behavior and to adhere to basic standards to neatness and cleanliness; and, (7) to travel in unfamiliar places or to use public transportation. (*Id*.). Additionally, Dr. Nerney also concluded that Plaintiff suffers limitations which *preclude* her ability to perform in the following areas *at all*: (1) to perform activities within a schedule; (2) to maintain attendance and punctuality within customary tolerances; (3) to sustain an ordinary routine without special supervision; (4) to work with or near others without being unduly distracted by them; (5) to work a normal workday and workweek without interruptions from psychologically based symptoms; (6) to perform at a reasonable and consistent pace without an unreasonable number and length of rest periods; (7) to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and (8) to set realistic goals or to make plans independently of others. (*Id*.).

Lastly, Dr. Nerney's Medical Source Statement (hereafter "MSS") related that in his opinion, Plaintiff suffered a "substantial loss" in two out of the four mental activities that are generally required by competitive, remunerative, unskilled work – namely, her ability to respond

1  appropriately to supervision, coworkers, and usual work situations; and, her ability to deal with

2  changes in a routine work setting. (*Id*. at 579). Dr. Nerney also noted that the limitations described

3  in his MSS have lasted at least 12 months, and can be expected to last at least 12 months, at the

4  assessed level of severity. (*Id*.). Indeed, he noted that while January 8, 2015, was the earliest date

5  that he had treated Plaintiff, that her "narrative of disability extends back into childhood." (*Id*.).

6  **THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

7  A person filing a claim for social security disability benefits ("the claimant") must show

8  that she has the "inability to do any substantial gainful activity by reason of any medically

9  determinable physical or mental impairment" which has lasted or is expected to last for twelve or

10  more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[1] The ALJ must consider all evidence in

11  the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-

12  step sequential evaluation process to determine whether the claimant is disabled (*see id*. §

13  416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that

14  the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

15  Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step

16  sequential evaluation. (*See* AR at 15-26).

17  At Step One, the claimant bears the burden of showing she has not been engaged in

18  "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. §

19  416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the

20  claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in

21  substantial gainful activity since her alleged onset date. (AR at 17).

22  At Step Two, the claimant bears the burden of showing that she has a medically severe

23  impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An

24  impairment is not severe if it is merely 'a slight abnormality (or combination of slight

25  abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'"

26

27  _____

[1] The regulations for supplemental security income (Title XVI) and disability insurance benefits
28  (Title II) are virtually identical, though found in different sections of the CFR. For the sake of
convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

*Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: anxiety, degenerative disc disease, depression, alcohol abuse, bilateral hand osteoarthritis, and post-traumatic stress disorder. (AR at 18). While the ALJ also found that Plaintiff had previously abused alcohol, because Plaintiff had refrained from substance abuse during the alleged period of disability the ALJ found that "this condition is not a factor relevant to the determination of disability in this case." (*Id*.). Additionally, the ALJ found that Plaintiff's hip bursitis was not medically determinable because the ALJ apparently took issue with the diagnosing physician's clinical diagnostic technique simply because Plaintiff's pelvic x-rays appeared normal. (*Id*.).

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (AR at 18-20). Next, the ALJ determined that Plaintiff retained the RFC "to perform medium work" with several physical and environmental limitations. (AR at 20-24).

At Step Four, the ALJ determined that Plaintiff is able to perform her past relevant work as a housekeeper. (AR at 25).

At Step Five, and in the alternative, the ALJ concluded that based on the testimony of the vocational expert, and the ALJ's formulation of the RFC, that Plaintiff was capable of making a successful adjustment to other work (such as laundry worker, hospital cleaner, and stores laborer) that existed in significant numbers in the national economy; and thus, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from March 8, 2012, through the date of the decision. (AR at 25-26).

\\

\\

**ISSUESS PRESENTED**

Plaintiff presents five closely related issues for review. Namely, that the ALJ improperly rejected Plaintiff's testimony, the lay witness testimony, as well as the opinion of Plaintiff's treating psychologist, resulting in the formulation of a legally deficient residual functional capacity. Plaintiff adds that if the improperly rejected evidence is credited as true, Plaintiff is unable perform her prior work, and would be considered disabled at Step Five because she has had a substantial loss in at least one of the four basic work-related activities, and because she can not sustain the mental or physical demands of work on a regular or continuing basis.

**DISCUSSION**

*Dr. Nerney's Opinion:*

Following many months of psychotherapy, as well as a battery of diagnostic testing, Plaintiff's treating psychotherapist reported that Plaintiff had been serially abused; that she had suffered formative traumas due to sexual and physical abuse throughout her adolescence as well as in her adult relationships; and that she still "has not yet formed an integrated and stable personality." On at least three occasions while discussing Plaintiff's history of trauma during therapy sessions, Dr. Nerney witnessed Plaintiff's panic attacks as manifested by her sweating, hyperventilating, having a flushed face, shaking, and expressing the need to leave or to have a door or window opened. Thus, he expressed, on more than one occasion, that Plaintiff suffers from a major depressive disorder and a post traumatic condition that renders her unable to maintain stable employment in either a supported or competitive environment because Plaintiff "experiences intolerable internal pressures when she is exposed socially under most circumstances." In short, Dr. Nerney concluded that Plaintiff suffered a "substantial loss" in two out of the four mental activities that are generally required by competitive, remunerative, unskilled work – namely, her ability to respond appropriately to supervision, coworkers, and usual work situations; and, her ability to deal with changes in a routine work setting. He added that these limitations have lasted, and can be expected to last at least 12 months, at the assessed level of severity.

Plaintiff argues that the ALJ improperly rejected Dr. Nerney's opinions. (Doc. 18 at 15-

21). Plaintiff notes the ALJ's reasons for rejecting Dr. Nerney's opinion were: (1) that the doctor failed to mention Plaintiff's past issues with alcohol in his MSS; (2) that the doctor's MSS form merely checked boxes and did not elaborate any explanations; and, (3) that the doctor's treatment notes or course of treatment do not support this level of inability or limitations. (*Id*. at 17). Plaintiff then addresses the ALJ's reasoning by first noting that the MSS form completed and submitted by Dr. Nerney specifically instructed him to exclude any limitations caused by alcoholism, and that moreover, the ALJ, herself, specifically found that Plaintiff's past alcohol use was not a relevant factor in her disability determination. (*Id*. at 17-18). Plaintiff then submits that Dr. Nerney's treatment notes were in fact consistent with his MSS, and that both the treatment notes and the course of treatment did in fact support the limitations that were the subject of Dr. Nerney's opinion. (*Id*. at 18-20). Plaintiff adds that because Dr. Nerney was the only psychologist to test and evaluate Plaintiff's mental functioning, that his opinions were not contradicted; indeed, Plaintiff notes that Dr. Nerney's MSS and treatment notes were not even reviewed by the non-examining non-treating state agency physicians who completed their review of her records in January of 2015, the same month that Plaintiff's treatment with Dr. Nerney began. (*Id*. at 18, 19-20). Finally, Plaintiff notes that because the ALJ essentially substituted her own opinion for that of a qualified physician, her rejection of Dr. Nerney's opinion was improper, and that if his opinion were credited as true, Plaintiff would be entitled to a disability finding at Step Five under SSR 85-15, because she has a substantial loss in two of the four mental abilities generally required for remunerative work. (*Id*. at 20-21).

In response, Defendant contends that Dr. Nerney's opinion was not uncontradicted because a non-examining state agency doctor reviewed Plaintiff's records, albeit prior to Dr. Nerney's treatment, and had indicated different limitations than what was opined by Dr. Nerney. (Doc. 27 at 15). Further, Defendant contends that the three reasons given by the ALJ for rejecting Dr. Nerney's opinion were valid; namely, that the MSS form provided no detailed explanation for the limitations, and that the treatment records and course of treatment did not support this level of inability. (*Id*. at 15). Defendant maintains that "it is unclear as to where Dr. Nerney is assessing moderate to severe limitations when his treatment notes are devoid of any such severe impairment

or advanced form of therapy." (*Id.* at 11). Defendant also submits that "Plaintiff's mental status examination was within normal limits, except for preoccupied and depressed thought content, partial insight, and mildly impaired ability to make reasonable decisions." (*Id.*). Suggesting that "most of Dr. Nerney's treatment records were simply recitations of Plaintiff's earlier trauma and financial stressors," Defendant also advances the notion that Plaintiff's mental health treatment was "conservative" due to having psychotherapy sessions on a monthly basis only, and due to only being prescribed some, rather than many, medications. (*Id.* at 12). Defendant also suggests that Plaintiff's prior alcohol use "is a consideration that Dr. Nerney should have assessed." (*Id.* at 13). Thus, it is Defendant's position that "the ALJ reasonably concluded based on the medical evidence that Plaintiff could engage in simple routine changes and occasional interaction with the public." (*Id.* at 14).

An ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Even when such an opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830-31. However, an ALJ "need not discuss all evidence presented." *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984). Instead, an ALJ must only explain why "significant probative evidence has been rejected." *Id.*; *see also Cotter v. Harris*, 642 F.2d 700, 706-07 (3rd Cir. 1981); *Garfield v. Schweiker*, 732 F.2d 605, 610 (7th Cir. 1984). Generally, more weight is given to a treating physician's opinion than to the opinions of those who do not treat a claimant. *See Lester*, 81 F.3d at 830. On the other hand, an ALJ need not always accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." *Batson v. Commissioner of Social Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion, however, is "entitled to greater weight than the opinion of a nonexamining physician." *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence only if "it is consistent with other independent evidence in the record." *Id.* at 830-31;

*Tonapetyan*, 242 F.3d at 1149.

Such was not the case here. Here, the ALJ's reasoning for rejecting the uncontroverted opinion of Plaintiff's treating psychotherapist was that Dr. Nerney's MSS form did not mention Plaintiff's prior alcohol use and also gave no explanations for the expression of Plaintiff's limitations. (AR at 24). However, as recited in detail above, Plaintiff's treatment record and Dr. Nerney's opinions regarding Plaintiff's limitations due to her mental health conditions are both extensive and thoroughly detailed, when viewed as a whole, as opposed to myopically focusing on a single document, that is, Dr. Nerney's Medical Source Statement. Further, the ALJ, who herself specifically found that Plaintiff's prior alcohol use "is not a factor relevant to the determination of disability in this case," (*see* AR at 18) can not logically fault Dr. Nerney (*see* AR at 24) for failing to mention her prior alcohol use on a Medical Source Statement form that specifically instructed him to refrain from making such mention. Thus, the court finds that the ALJ's reasoning for discounting Dr. Nerney's opinions is not supported by any evidence in the record, let alone by substantial evidence, and that the ALJ's reasons for rejecting this opinion were not legitimate. Further, the court finds that Dr. Nerney's opinion as to Plaintiff's limitations, expressed in his Medical Source Statement, is in fact supported by, and harmonious with, his clinical treatment notes, with his reports of Plaintiff's diagnostic test results, and with the many reports and notes of Plaintiff's primary care physician as well. Accordingly, it was error for the ALJ to reject this evidence.

### *Plaintiff's Testimony and Lay Witness Testimony*:

The ALJ rejected Plaintiff's testimony and the lay witness testimony as to the severity of her mental limitations by suggesting that her mental health treatment was conservative and minimal, and also because Plaintiff and Ms. Wilcox only see one another every two months, that Ms. Wilcox does not have personal knowledge of Plaintiff's limitations. In pertinent part, Plaintiff testified that between January and May of 2016, she briefly worked as a cashier, two days per week for approximately 5 hours per day, but that she was forced to stop working in that capacity due to her physical limitations (pain in her wrists, lower back, and hip), and also due to her intense anxiety about dealing with people, resulting in anxiety attacks which happened at least three times

during any given workday and which would cause her to need to go outside and be alone for several minutes in order to calm down while other employees took over her duties. She also testified that she lost a previous job as a waitress because she frequently needed to "hide in the back" while her coworkers handled her duties. Plaintiff related that she had suffered anxiety attacks for many years, and described them as involving a profound difficulty with breathing, a perception of tunnel vision, and a feeling that she was about to lose consciousness; and that she continues to experience such attacks on a daily basis, even when at home. Plaintiff also related that she suffers from depression and that it leaves her with no drive such that she can not make herself leave her room, or be around people. Regarding prior alcohol use, Plaintiff testified that while she used to drink two to three beers a night to help her sleep, that she had completely discontinued drinking in June of 2016.

Further, Plaintiff's mother, Ms. Norma Wilcox, completed and submitted an SSA form entitled, "Function Report – Adult – Third Party," relating that she sees her daughter once every two months, but that they generally speak with each other daily. Ms. Wilcox described Plaintiff's primary impediment to her ability to do any work at all as being rooted in her intense anxiety in interacting with people. She related that Plaintiff rarely leaves the house, that she does not associate with anyone socially, and that "she doesn't want to see anybody, even family members." Ms. Wilcox described Plaintiff's various conditions as affecting her ability to lift or otherwise use her hands, as well as her memory, understanding, concentration, and her ability to complete tasks in that she can only follow instructions "after being told several times or more."

In this regard, Plaintiff first contends that because there was no evidence of malingering, the ALJ was required to make specific, clear, and convincing findings to support an adverse credibility determination. (Doc. 18 at 21). Plaintiff argues that the ALJ's finding that Plaintiff's treatment was minimal and conservative was without explanation, essentially substituting her own opinion for that of a treating physician. (*Id*. at 21-22). Plaintiff adds that the ALJ inaccurately summarized the record by finding that Plaintiff's panic attacks were only "intermittent," and that the ALJ erred in relying on the absence of documentation by suggesting that while Plaintiff testified to having *regular* panic attacks during medical appointments, that there was only *limited*

documentation of such. (*Id.* at 24-25). Likewise, Plaintiff argues that the ALJ's explanation for rejecting Plaintiff's mother's testimony was legally insufficient because the ALJ erroneously reasoned that because Plaintiff and her mother (Ms. Wilcox) only see one another every couple of months and only speak on the phone daily, that Ms. Wilcox does not have personal knowledge of Plaintiff's limitations. (*Id.* at 25-26). Accordingly, Plaintiff contends that her testimony, and that of her mother, should be credited as true. (*Id.* at 25, 26).

In response, Defendant contends that this testimony was properly rejected because Plaintiff in fact only "had minimal treatment and conservative care and that the objective treatment record does not support the level of inability alleged." (Doc. 27 at 15-16). Defendant again submits that the record only reflects a "minimal level of care for mental health," while also suggesting that Plaintiff told her primary care provider, Dr. Hobson, that "she did not need additional psychiatric treatment and felt better after therapy sessions with Dr. Nerney. (*Id.* at 16, citing AR at 502). However, Defendant is mistaken, the record unmistakably reflects that Plaintiff told Dr. Hobson on June 10, 2016, that although *her therapist* does not think she needs therapy *she* thinks she feels better after therapy sessions and that they help her make plans and stay on track. (*See* AR at 502). In any event, Defendant also submits that x-rays revealed Plaintiff's wrist arthritis was only mild. (Doc. 27 at 21). However, Defendant is again mistaken, as stated in her report, Dr. Humphries opined that while Plaintiff suffered mild osteoarthritis in both wrists involving multiple distinct locations, she also opined that Plaintiff suffered from *moderate* osteoarthritis in her left wrist at three locations. (*See* AR at 645). Defendant also submits that the ALJ correctly discounted testimony about Plaintiff's mental impairments because while Plaintiff reported anxiety, she was still able to perform some short-term and part-time employment after her alleged onset date. (Doc. 27 at 22). Defendant also suggests, without expressly stating it, that the ALJ's reason for rejecting the testimony of Plaintiff's mother was valid because they would only see one another every couple of months, while speaking on the phone daily, which somehow precludes Ms. Wilcox's ability to have personal knowledge of her daughter's limitations. (*Id.* at 22-23). Lastly, Defendant suggests that the function reports submitted by Plaintiff and her mother were "nearly identical," however, this is neither correct nor was this a notion relied upon or articulated by the ALJ. (*Id.* at

17).

In determining credibility, an ALJ must inquire whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007), quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991). An adverse finding of credibility must be based on clear and convincing evidence where there is no affirmative evidence of the claimant is malingering and where "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). An ALJ may not discredit testimony as to the severity of symptoms only because that testimony is unsupported by objective medical evidence. *See Bunnell*, 947 F.2d at 347-48. In addition, an ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834; *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Lastly, an ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004). Here, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR at 22). However, the ALJ determined Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*).

Here, as there is no suggestion or evidence of malingering, the ALJ's adverse credibility findings must have necessarily been based on clear and convincing evidence. However, that was not the case. The ALJ premised her adverse credibility determination as to Plaintiff's testimony about her intense anxiety and depression on the incorrect notion that Plaintiff only had "minimal treatment" and "conservative care." The ALJ also incorrectly chose to focus her credibility determination as to Plaintiff's testimony on the notion that Plaintiff was able to do some temporary part-time work after the alleged onset date. To discount Plaintiff's testimony regarding the debilitating effects of her anxiety, PTSD, and depression on this basis would require

overlooking the entire course of Plaintiff's history of psychological treatment and its associated clinical and diagnostic records. Furthermore, the ALJ discounted the testimony of Ms. Wilcox because of the erroneous conclusion that Ms. Wilcox had no personal knowledge of her daughter's limitations. The court finds that the ALJ's reasons for discounting Plaintiff's testimony, as well as that of her mother, were not supported by any evidence in the record, let alone substantial evidence. Instead, the court finds the totality of this testimony to be consistent and harmonious with the overwhelming bulk of medical evidence in the record. Accordingly, the ALJ erred in discounting the testimony of Ms. Wilcox, as well as Plaintiff's own testimony, about the extent and severity of Plaintiff's physical and mental limitations.

### *The Vocational Expert Testimony*:

Based on above-described errors, the ALJ formulated several flawed hypotheticals for the VE's consideration. The first two cast Plaintiff as someone capable of performing medium work with certain exertional limitations and with occasional interaction with the public, the third was similar but replaced medium work with light work. The VE suggested that such a person could perform the work of a housekeeping cleaner, office helper, handmade Mexican food maker, or photocopy machine operator. Notably, the VE testified if an individual were off-task for as little as 10% of the time, there would be no work available for such a person, also, that anything over eight hours per month of absences from work on a consistent basis would mean that there would be no work available for such a person.

### *The ALJ's Decision*:

Again, based on the above-described errors, the ALJ formulated a flawed RFC that provided Plaintiff was capable for performing medium work with certain exertional limitations, with simple routine tasks, with simple routine changes, and with occasional interaction with the public. (AR at 20). Further, the ALJ found, at Step Four, that Plaintiff was capable of performing past relevant work as a housekeeper; and, at Step Five, the ALJ found, in the alternative, that Plaintiff could successfully adjust to other jobs such as laundry worker, hospital cleaner, or stores laborer. (AR at 25-26).

The court has reviewed and considered the record as a whole, including the testimonial and

medical evidence of Plaintiff's physical and mental impairments and limitations. The court finds that the ALJ erroneously disregarded, or discredited, this evidence. The court concludes that the ALJ's failure to properly evaluate the evidence caused the formulation of a flawed RFC, and flawed determinations at Step Four and Step Five of the sequential evaluation process. Instead, the court finds that but for the ALJ's errors, the overwhelming evidence required the ALJ to find Plaintiff disabled at Step Five. The ALJ did not follow the appropriate methodology for weighing a treating physician's medical opinion; and, as discussed, there is no legitimate stated reason for rejecting Dr. Nerney's opinion. As such, the ALJ erred by giving the opinion "partial weight" and instead should have found it to be controlling. Because the VE testified that a claimant with limitations such as those outlined in Dr. Nerney's medical opinion (limitations that would cause one to be off-task as little as 10% of the time, or to miss more than 8 hours of work per month consistently) would be unable to do any full-time work, Dr. Nerney's opinion "alone establishes that [Plaintiff] is entitled to benefits" – thus, the ALJ should have credited Dr. Nerney's opinion and found that Plaintiff was disabled. *See Trevizo v. Berryhill*, 871 F.3d 664, 677 (9th Cir. 2017). Thus, in light of the VE's testimony, Plaintiff is precluded from employment because Dr. Nerney opined that Plaintiff's limitations completely preclude her from being able to perform activities within a schedule, or maintaining attendance and punctuality within customary tolerances, or to work a normal workday without interruptions from psychologically based symptoms, or to perform at a reasonable and consistent pace without an unreasonable number and length of rest periods. Because the ALJ did not provide a legally sufficient basis for rejecting the opinion of Plaintiff's treating physician, the ALJ erred. *See e.g., Lingenfelter v. Astrue*, 504 F.3d 1028, 1041 n. 12 (9th Cir. 2007) ("The dissent argues that it is necessary to remand Lingenfelter's claims for further proceedings because the ALJ might reject the medical opinions of Lingenfelter's primary treating physicians. We disagree. Further proceedings are unnecessary because the ALJ did not provide a legally sufficient basis for rejecting Lingenfelter's testimony, which alone establishes that he is entitled to benefits.").

### Credit-As-True Doctrine:

Having found that the Commissioner committed error by not finding Plaintiff disabled at

Step Five based on the VE's testimony and the evidentiary record, the court must now decide if remand for further proceedings are appropriate. It is well established that "[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded [for further proceedings]." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). It is equally well established that courts are empowered to affirm, modify, or reverse a decision by the Commissioner, "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014). Generally, remand with instructions to award benefits has been considered when it is clear from the record that a claimant is entitled to benefits. *Id*.

The credit-as-true doctrine was announced in *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396 (9th Cir. 1988) ("*Varney II*"), where it was held that when "there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony . . . [instead] we will . . . take that testimony to be established as true." *Id*. at 1401. The doctrine promotes fairness and efficiency, given that remand for further proceedings can unduly delay income for those unable to work and yet entitled to benefits. *Id*. at 1398.

The credit-as-true rule has been held to also apply to medical opinion evidence, in addition to claimant testimony. *Hammock v. Bowen*, 879 F.2d 498, 503 (9th Cir. 1989). The standard for applying the rule to either is embodied in a three-part test, "each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020.

It should also be noted that "the required analysis centers on what the record evidence

24

shows about the existence or non-existence of a disability." *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011). Thus, even though all conditions of the credit-as-true rule might be satisfied, remand for further proceedings would still be appropriate if an evaluation of the record as a whole creates a "serious doubt" that a claimant is, in fact, disabled. *Garrison*, 759 F.3d at 1021. On the other hand, it would be an abuse of discretion for a district court to remand a case for further proceedings where the credit-as-true rule is satisfied and the record affords no reason to believe that the claimant is not, in fact, disabled. *See id*. Here, Plaintiff provided personal testimony, lay witness testimony, and extensive medical opinion evidence regarding her physical and mental impairments and the resulting limitations; however, as discussed, this evidence was improperly discounted by the ALJ.

*Record Development:*

The first part of the credit-as-true test requires the court to determine whether the record has been fully developed and if further administrative proceedings would serve any useful purpose. As stated, the record clearly established that Plaintiff suffers from chronic PTSD manifesting in severe anxiety and depression rooted in having been serially abused from the formative years of her adolescence well into adulthood. In the opinion of her treating psychotherapist, although Plaintiff is a person of "advanced age," she still "has not yet formed an integrated and stable personality." Following a lengthy period of analysis, psychotherapy, and diagnostic testing, her treating physician opined that Plaintiff suffers from a major depressive disorder and a post traumatic condition that renders her unable to maintain stable employment because she "experiences intolerable internal pressures when she is exposed socially under most circumstances." Thus, the longitudinal medical evidence amply supports Dr. Nerney's conclusion that Plaintiff suffered a "substantial loss" in two out of the four mental activities that are generally required by competitive, remunerative, unskilled work – namely, her ability to respond appropriately to supervision, coworkers, and usual work situations; and, her ability to deal with changes in a routine work setting. Accordingly, because the record manifests overwhelming evidence that Plaintiff is unable to maintain stable employment due to experiencing "intolerable internal pressures when she is exposed socially under most circumstances," and because the VE

25

testified that there is no work to be found for anyone who would be off-task as little as 10% of the time, or absent as little as 8 hours per month on a consistent basis, the court finds that the record is fully developed, and that further administrative proceedings would serve no useful purpose.

*Reasons for Rejecting the Evidence:*

The second part of the credit-as-true test requires the court to determine if the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion. As discussed above, the court finds that the ALJ's reasoning for rejecting this evidence was unsupported by the record and legally insufficient.

*The Effect on Disability Determination:*

The final part of the credit-as-true test requires the court to determine whether the ALJ would be required to find Plaintiff disabled on remand if the improperly discredited evidence were credited as true. Here, crediting Plaintiff's testimony, the lay witness testimony, and the medical opinions and evidence of her treating physicians and specialists as true would indeed require a finding of disability at Step Five because the improperly discredited evidence, in light of the VE's testimony, established that Plaintiff's mental impairments and their resulting limitations make it clear that Plaintiff is unable to either work in her previous capacity, or to transition into any other available employment. The court therefore finds that all three parts of the credit-as-true test are satisfied.

*Evaluation of the Record as a Whole:*

Upon finding that all elements of the credit-as-true standard are satisfied, this court must then evaluate the record as a whole in order to determine whether the record gives rise to any serious doubt that a claimant is, in fact, disabled. *See Garrison*, 759 F.3d at 1020-21.

One points bears mentioning at this juncture. It should be noted that the Social Security Act defines "disability" as the inability to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). Dr. Nerney specifically noted that Plaintiff's mental impairments have lasted at least 12 months, and that in fact "her narrative of disability extends

back into childhood." (AR at 579).

Thus, because a review of the record as a whole gives rise to no serious doubt that Plaintiff is in fact disabled, this matter is remanded to the Commissioner for calculation and award of appropriate benefits.

## CONCLUSION

For the reasons stated above, the court GRANTS Plaintiff's motion for summary judgment, DENIES Defendant's motion for summary judgment, REVERSES the ALJ's determination and REMANDS this matter for calculation and award of appropriate benefits.

The court will issue a separate judgment.

**IT IS SO ORDERED.**

Dated: September 13, 2018.

ROBERT M. ILLMAN
United States Magistrate Judge